UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-460-H

PARIS PACKAGING, INC.                                                    PLAINTIFF

v.

FLINT GROUP NORTH AMERICA                                                DEFENDANT
CORPORATION

**MEMORANDUM OPINION**

Plaintiff, Paris Packaging, Inc. ("Paris"), brings this action against Flint Group North America Corp. ("Flint") alleging a breach of contract. Paris manufactures packaging for food and other products. Flint provided Paris with ink used in its manufacturing processes, subject to a contract dated April 2007 (the "Supply Agreement"). Paris claims that Flint breached that contract by supplying its Hopkinsville facility defective ink that rendered useless more than $300,000 worth of finished product.

Before the Court are Plaintiff's Motion for Partial Summary Judgment on the issue of liability and Defendant's Motion for Summary Judgment. The parties have briefed these motions and thoroughly discussed their arguments with the Court in a conference. These two motions address many of the same issues and, therefore, the Court will discuss them as one.

I.

Paris produces paperboard packaging for fast food restaurants. In 2007, Paris began supplying KFC U.S. Properties, Inc. ("KFC") with millions of containers used to hold KFC's "Popcorn Chicken" product. The graphics on these containers required several ink colors,

including black. During the first year of production Paris used Flint's "Line Black" ink to make the Popcorn Chicken containers. After some discussion between Paris's Hopkinsville Plant Manager and one of Flint's on-site graphic technicians, Paris switched to using Flint's "Process Black" ink, which costed $0.13 less per pound, a significant savings given Paris' high-volume demands.[1] The switch occurred on April 1, 2008 and thereafter Paris produced roughly forty million Popcorn Chicken containers over a ten-month period.

In February 2009, KFC informed Paris that it had recently received two reports from customers that Popcorn Chicken containers placed in microwave ovens had ignited and burned along black ink lines that outlined a graphic of the KFC Colonel. Based upon subsequent testing, KFC concluded that use of Process Black ink somehow caused the containers to ignite. As a consequence, KFC ordered its stores to stop using Paris-made containers.

KFC then sued Paris in federal court seeking damages of $757,000.00 for containers it could no longer use. The Court found Paris had breached its contract with KFC as a matter of law. *KFC U.S. Properties, Inc. v. Paris Packaging, Inc.*, No. 3:09-CV-249-H, 2010 WL 724653, at *3 (W.D. Ky. Feb. 25, 2010). After the Court's finding on liability, Paris invited Flint to participate in a mediation session with KFC. Flint declined to participate, asserting that it had no fault in the matter. Paris eventually settled the case with KFC, then filed this action against Flint. In this case, Paris claims Defendant's Process Black ink caused more than $300,000 in wasted finished product and thus breached a term of the Supply Agreement.

---

[1] Paris used the ink which Flint supplied on other jobs in addition to its KFC work.

II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment bears the initial burden "to demonstrate that an essential element of the nonmoving party's case is lacking." *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The burden then shifts to the non-moving party to show a genuine dispute exists as to that element, defeating the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court reviews evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). These same rules apply when addressing cross-motions for summary judgment. *Atlantic Richfield Co. v. Monarch Leasing Co.*, 84 F.3d 204, 206 (6th Cir. 1996). If the case's essential facts are undisputed, then "one of the parties is clearly entitled to summary judgment." *Id.* (citing *Niecko v. Emro Mktg.*, 973 F.2d 1296, 1304 (6th Cir. 1992)).

III.

Both Paris and Flint move for summary judgment as to the breach-of-contract claim, which rests upon an interpretation of the Supply Agreement. Pursuant to its choice-of-law provision, the Court will construe the contract according to Michigan law.

The elements of a breach-of-contract claim under Michigan law are: (1) the existence of a contract; (2) the contract terms require performance of certain actions; (3) a party breached the

3

contract; and (4) the breach caused the complaining party's injury. *Woodland Harvesting, Inc. v. Georgia Pacific Corp.*, 693 F.Supp.2d 732, 737 (E.D. Mich. 2010) (quoting *Burton v. William Beaumont Hosp.*, 373 F.Supp.2d 707, 718 (E.D. Mich. 2005). The Court will give contract terms their plain and ordinary meaning, but must analyze the contract as a whole, giving a fair and reasonable interpretation. *Woodland*, 693 F.Supp.2d at 737 (citing *Meagher v. Wayne State Univ.*, 565 N.W.2d 401 (Mich. Ct. App. 1997)). A contract's meaning only becomes a question of fact when its language is ambiguous and a court "may not impose an ambiguity on clear contract language." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) (citations omitted). The parties dispute the scope of Flint's duties under the contract.

A.

The crucial contract term governing this dispute is § 1.7 of the Supply Agreement, titled "Warranty, Limitation of Liability and Indemnity." This provision defines the scope of Flint's responsibilities and limits the extent of its financial liability. Subsection (A) provides:

> <u>Warranty</u> Flint Group warrants that the Products will meet written specifications and changes jointly approved by both parties. In the event of a failure of any Product to meet such specifications, Flint Group's obligation shall be limited to refund or replacement of the Product. If Flint Group products cause excessive downtime or waste, Flint Group will be responsible. If Paris Packaging knowingly continues to run questionable product, Flint Group will not be held responsible. THERE ARE NO OTHER WARRANTIES EXPRESS OR IMPLIED INCLUDING SPECIFICALLY ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A SPECIFIC PURPOSE.

Section 1.7 goes on to disclaim Flint's liability "for any other claims, regardless of the form of action, or for any other damages" and that Paris agrees to indemnify Flint "from and against any claim made by any third party." For Paris to succeed on its contractual claims, it must show a breach and causation. Though Paris can probably show that Flint's ink caused ignition during

4

microwave use, the issue of breach resolves the case.[2]

B.

Paris argues that the language, "[i]f Flint Group products cause excessive downtime or waste, Flint Group will be responsible," establishes a duty that Flint breached by supplying Process Black ink that was flammable. Because KFC rejected all of Paris's Popcorn Chicken containers that used Flint's Process Black ink, Paris says that the Popcorn Chicken containers became waste, and that Flint is financially responsible.

Flint responds that it is only responsible for damages where it breached a term of the Supply Agreement. The graphic proofs KFC gave Paris specified "Black L PROCESS." Pl.'s Mot. Summ. J. Ex. 12. Bill Carver, Paris's president, testified that he was unaware of any written specification with which Flint did not comply. Def. Mot. Summ. J. Ex. 6 at 25. Nowhere does Paris say that the Process Black ink requires a certain carbon content and, if it did, that any variation in the carbon content failed to meet any written specification. Absent a failure to meet such specifications, Flint argues, they cannot be held liable for any measure of damage, waste or otherwise, under the Supply Agreement.

The Court concludes that the plain language only expands the scope of Flint's financial responsibility in the event of a breach. The "waste" provision does not create a new warranty. Indeed, Paris' interpretation would conflict with Flint's specific warranty disclaimers. Flint did not warrant its product to be fit for use in a microwave or any other specific purpose. In fact, it disclaimed such a warranty. Interpreting the "waste" clause as imposing a strict liability duty

---

[2] The key issue of causation is whether Flint's ink was flammable during microwave use. The record has sufficient evidence, including lay witnesses who observed Flint's Process Black ink ignite in microwave ovens and an expert report finding the ink flammable, by which a reasonable jury could conclude that Flint's ink was flammable and thus caused KFC to reject Paris's containers.

would be completely contrary to § 1.7(A)'s warranty language. Contract interpretation that "entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all its provisions." *DeBoer v. Geib*, 238 N.W. 226, 226 (Mich. 1931); *accord Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1025 (6th Cir. 1995) (citing *Johnston v. Miller*, 40 N.W.2d 770, 771-72 (Mich. 1950)).

Section 1.7(A) commits Flint to meeting written specifications, then lays out the scope of damages for which Flint is liable if it fails to do so. Any failure to meet written specifications obliges Flint only to refund or replace the noncompliant ink product. The "waste" clause carves an exception to the limitation on damages. Thus, in the event of a breach, Flint is responsible not only for refunding or replacing the ink, but also for the downtime or waste. It does not, however, articulate a separate underlying duty. The next sentence in § 1.7(A) cuts off Flint's liability for downtime and waste once Paris knows the noncompliant ink is producing "questionable product." Finally, § 1.7(A) concludes by explicitly disclaiming all "other warranties express or implied including specifically any implied warranty of merchantability or fitness for a specific purpose."[3]

Paris has failed to allege and has admitted the absence of evidence that Flint breached any written specification. Flint cannot breach a contract term to which it never agreed. Without evidence showing breach, Paris cannot prevail on its breach-of-contract claim.

---

[3] The contract language meets Michigan's statutory requirements for excluding implied warranties. Mich. Comp. Laws § 440.2316 (2009).

IV.

It may seem unfair or illogical that Paris is contractually responsible to KFC, but Flint has no corresponding contractual liability to Paris. The differences between the Supply Agreement and the contract between Paris and KFC explain the outcomes in KFC's successful contract suit against its supplier, Paris, and Paris's unsuccessful claim against its supplier, Flint.

The KFC-Paris contract required Paris "to provide a safe product and one fit for reasonably foreseeable uses, regardless of any specifications that may have been provided." *KFC U.S. Properties, Inc. v. Paris Packaging, Inc.*, No. 3:09-CV-249-H, 2010 WL 724653, at *2 (W.D. Ky. Feb. 25, 2010). The contract expressly precluded Paris from "rely[ing] upon any specification given to it as a defense to its obligations." *Id.* Moreover, that contract did not waive any implied warranties of merchantability or fitness for a specific purpose by Paris. In contrast, the Supply Agreement clearly disclaims any type of warranty by Flint other than meeting written specifications. It does not, as is sometimes the case, incorporate provisions of the KFC-Paris contract and impose those requirements on Flint.

This liability scheme in the Supply Agreement is sensible, given the parties' positions as a manufacturer and component supplier. Paris, the manufacturer, was in the better position to know how its finished products would be used and the potential risks from that use. Flint, the supplier, was in the better position to ensure its ink met written specifications. Section 1.7(A) holds Flint accountable for what it is best able to guarantee and releases it from liability for harm caused by particular uses of Paris' finished product.

Where the contract language is clear, as it is here, a court's role is to enforce the parties' bargained-for obligations. *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich.

Ct. App. 2010) (citing *Rory v. Continental Ins. Co.*, 664 N.W.2d 776 (Mich. 2003)). KFC bargained for greater contractual protections from Paris than Paris did from Flint. Given the relative positions of the parties, perhaps this is not surprising. The Court's decisions merely have held the parties to the respective terms of these contracts upon which they agreed.

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record